IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARYLYNN OSTERGAARD,                )
                                    )
                    Plaintiff,      )
                                    )
            v.                      )        Civil No.  07-834-JE
                                    )
MICHAEL J. ASTRUE,  Commissioner    )        OPINION AND ORDER
 of Social Security,                )
                                    )
                    Defendant.      )
_____)

        Richard A. Sly
        1001 S.W. 5th Avenue, Suite 310
        Portland, OR 97204

        Linda Ziskin
        3 Monroe Parkway, Suite P
        Lake Oswego, OR 97035

            Attorneys for Plaintiff


        Karin J. Immergut
        U.S. Attorney, District of Oregon
        Britannia I. Hobbs
        Asst. U.S. Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, OR 97204-2902

1 - OPINION AND ORDER

David Morado
Regional Chief Counsel
Carol A. Hoch
Special Asst. U.S. Attorney
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

     Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Marylynn Ostergaard brings this action pursuant to 42 U.S.C. 405(g) seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income benefits (SSI). For the reasons set out below, the Commissioner's decision is affirmed.


## **Procedural Background**

After suffering brain, shoulder, and knee injuries in a motor vehicle accident in 1994, plaintiff applied for DIB. She was found to be disabled, and received benefits for a period extending from February 3, 1994, through September 1, 1995. Plaintiff returned to full-time work on September 20, 1995, and did not appeal the determination that her disability had ceased as of September 1, 1995.

On December 30, 1998, plaintiff filed a new application for DIB, alleging that she had been disabled since June 7, 1998. Plaintiff's claim was denied initially and upon reconsideration, and was denied by an Administrative Law Judge (ALJ) on July 14, 2000, following a hearing. The ALJ concluded that plaintiff had an organic mental disorder that was "severe" within the meaning of relevant Social Security regulations, but that did not prevent plaintiff from performing her past relevant work as a cannery worker, or from performing other jobs that existed in substantial numbers in the national economy.

Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act (the Act).  Plaintiff did not seek review of that decision.

Plaintiff filed applications for DIB and SSI benefits on February 21, 2003, alleging that she had been disabled since December 31, 1999, because of severe mental problems. After that application was filed initially and upon reconsideration, plaintiff requested a hearing before an ALJ.

A hearing was held before ALJ Ralph Jones on November 21, 2005.  In a decision issued on December 30, 2005, ALJ Jones found that plaintiff was not disabled.  That decision became the final decision of the Commissioner on April 25, 2007, when the Appeals Council denied plaintiff's request for review.  In the present action, plaintiff seeks judicial review of that decision.

### Factual Background

Plaintiff was born on October 11, 1969, and was 36 years old when ALJ Jones issued his decision in December, 2005, finding that she was not disabled.  Plaintiff has completed four years of college, and is within 8 credits of earning a bachelor's degree in speech language pathology and hearing sciences.  She has past relevant work experience as an aerobics instructor and sales clerk.  She was teaching aerobics four hours per week at the time of the hearing before  the ALJ in November, 2005.

Plaintiff alleges that she is disabled because of the combined effects of severe mental problems which resulted from a closed head injury; cognitive disorder, NOS; personality change due to head injury; reduced intellectual abilities; adjustment disorder with mixed disturbance of emotions and conduct; depression; anxiety; and stress urinary incontinence.

### Medical Record

As noted above, plaintiff was injured in a motor vehicle accident in 1994.  Her injuries included a closed head injury, cerebral hemorrhages, lacerations to the scalp, a left

forehead hematoma, left hemopneumothorax, rib fractures, a left knee injury, splenic

contusion, and abrasions and contusions. After nearly two weeks of hospital treatment, on

February 16, 1994, plaintiff was assigned to the brain injury team at the Rehabilitation

Institute of Oregon. Danielle Erb, M.D., was plaintiff's treating physician. In notes from an

outpatient clinic visit on April 29, 1994, Dr. Erb noted that plaintiff had undergone knee

surgery on April 12, 1994, that plaintiff had cognitive deficits, and that plaintiff was

receiving speech therapy and physical therapy. On May 11, 1994, Dr. Heather Beecher also

noted that plaintiff had suffered a brain injury, and that she had cognitive deficits.

On June 3, 1994, Dr. Erb noted that plaintiff was depressed, and was continuing to

receive speech therapy and physical therapy two times per week. Dr. Erb stated that plaintiff

"realized how poorly she was doing in multiple testing areas." On July 11, 1994, Dr. Erb

noted that plaintiff was depressed because of her cognitive deficits, and expressed thoughts

of suicide. Dr. Erb stated that plaintiff needed more therapy to deal with her deficits, and

opined that plaintiff's memory could improve with a consistent therapy schedule.

On September 30, 1994, Dr. Erb noted that plaintiff had "some rather dramatic

improvements in her memory." She also noted that plaintiff's physical condition was

improving and that plaintiff was doing some light aerobic exercise, though plaintiff was

concerned about her weight gain. Dr. Erb stated that plaintiff was much more relaxed than

she had been during earlier appointments, and that she was better organized and was

remembering more information.

On December 29, 1994, Dr. Erb noted that plaintiff was "continuing to make good

progress." Plaintiff reported that she was quite physically active, and that she was

experiencing significant knee pain after running for 80 minutes a few days earlier. Plaintiff

reported increased pain in her upper shoulder regions bilaterally, and increased problems

with bladder control, which had been addressed in earlier appointments. Dr. Erb indicated

that plaintiff was making significant cognitive improvements, asked more in depth questions,

and showed better understanding.

On March 3, 1995, Dr. Erb indicated that plaintiff had started working in the shoe sales department at Nordstrom three weeks earlier, and that she was working 8 hours per day, 4 days per week. Plaintiff also reported that she was taking a lifeguard class 3 days per week, and was doing a significant amount of studying. Plaintiff reported that her memory deficit was the most frustrating deficit for her, and said she worried that she would forget things at work. Dr. Erb was concerned that plaintiff was pushing herself too hard, and advised plaintiff to reduce her activities.

On June 1, 1995, Dr. Erb indicated that plaintiff was working 40 hours per week at Nordstrom and teaching a water aerobics class. Plaintiff reported that she had not passed her lifesaving class, and was angry because she thought that the person teaching the class had not been honest with her. Dr. Erb stated that plaintiff was "angry at everything," and that she had great difficulty dealing with her anger. Plaintiff stated that she was angry at the Community Re-Entry Services Program (CRE) through which she had received therapy following her accident. Plaintiff was somewhat depressed, and reported difficulty falling asleep and staying asleep. Dr. Erb reported that plaintiff was using her memory notebook appropriately.

On August 3, 1995, Dr. Erb indicated that plaintiff was "doing very well." Plaintiff reported that she had been working 11 to 14 hours per day during a shoe sale, had been able to run up and down stairs without bothering her knee, was able to work with multiple customers at one time, and was "remembering a great deal of information." In addition, plaintiff continued to teach aerobics classes. Plaintiff also reported that she was continuing to work with Dr. Berdine, a neuropsychologist, who was considering doing some retesting of plaintiff's memory skills "to help her make the decision whether or not she should be returning to school." Dr. Erb indicated that plaintiff appeared to be fatigued, demonstrated good concentration and attention, and was not as angry as she had been during the previous appointment.

Plaintiff discussed her ongoing depression problems with Dr. Beecher on March 10, 1998.  Plaintiff told Dr. Beecher that she had been teaching six aerobics classes, working at Nordstrom, and attending school.  Plaintiff reported that she had stopped teaching because she felt overloaded.  She also stated that she felt a loss of purpose, was getting poor grades in school, was fighting more with her boyfriend, was having difficulty sleeping, and experienced reduced concentration.  She denied suicidal ideation.  Dr. Beecher diagnosed depression and prescribed Prozac.

Cheryl Brischetto, Ph.D., a consulting psychologist, performed a neuropsychological evaluation of plaintiff on February 16, 1999.  Plaintiff told Dr. Brischetto that she had been bulimic between the ages of 10 and 17, and that she had been hospitalized for this condition.  She also reported that she had worked as a part-time aerobics instructor for 11 years, and that she had worked for Nordstrom for 10 years.  Plaintiff reported that she had been terminated from Nordstrom in June, 1998.  Plaintiff stated that she was not sure why she had been terminated, but reported that she had had an altercation with another employee and a "run-in" with a manager, and thought she might have been terminated because of her "vocabulary."  Plaintiff told Dr. Brischetto that she was concerned about being fired again if she tried to work, and that her memory problems and temper had been problems at work.  She also told Dr. Brischetto that she had not taken the Prozac prescribed by Dr. Beecher.  She reported feelings of depression, mood swings, anger, and anxiety, and stated that she became irritable very easily.  Plaintiff also reported sleep problems, recent weight gain, and thoughts of suicide.  Plaintiff stated that she had been tearful almost every day since her accident, and that she was so anxious that she was occasionally afraid to leave her house.  Plaintiff told Dr. Brischetto that she became frightened about being killed, and felt that other people, such as bosses at work, were against her.

Plaintiff told Dr. Brischetto that she was able to perform most activities required for daily living, such as managing her money, paying her bills, and cooking and cleaning.  Plaintiff reported that she did not have a driver's license and did not drive, but was able to

take the bus, although she sometimes had difficulty doing so.  Plaintiff told Dr. Brischetto that her memory was poor, and that she had to write down important things in order to remember them.  She also reported that she had problems maintaining focus, and that, since the accident, she had problems with math and writing, and would sometimes invert letters and "switch words."

Dr. Brischetto indicated that plaintiff was well groomed, talkative, irritable, hyperactive, and cooperative, and that she worked hard during the Mental Status Examination (MSE).  Plaintiff's expressive language was rated as clear and coherent, though plaintiff sometimes had mild problems finding the correct words.  Plaintiff's vocabulary was rated in the "average" range, and her performance on an Aphasia Screening Exam was "mostly unremarkable except for some mild distortion in her drawing of a key and triangle, and difficulty with oral math."  She did not display unusual thought content, but did  express some mild paranoid ideation.  Plaintiff's basic reasoning and judgment were intact, and her memory was found to be in the average range on most tests.  Plaintiff's memory was in the low average range for timed performance tasks, and was in the borderline range for processing speed index.  Plaintiff's performance IQ was 80, which is in the low average range; her verbal IQ was 92, which is average; and her full scale IQ was 87, which is low average.  Dr. Brischetto found that plaintiff's affect was "somewhat limited," and noted that plaintiff "seemed to get angry easily, particularly when talking about certain subjects."

Plaintiff scored in the "severe" range of depressive symptoms on the self-reporting Beck Depression Inventory.  Dr. Brischetto opined that plaintiff's mental abilities had probably declined following her accident, and diagnosed Cognitive Disorder, NOS: Personality change due to head injury; and Rule out other mood disorder, NOS.  She rated plaintiff's Global Assessment of Functioning (GAF) at 51.

Plaintiff began receiving services at Network Behavioral HealthCare in July, 1999.  On intake, plaintiff was diagnosed with an Adjustment Disorder with mixed disturbances of emotions and conduct and Personality Change due to head trauma, combined type.  Impaired

memory and minimally impaired insight were noted, and plaintiff's GAF was rated at 55. A chart note dated August 13, 1999, indicated that plaintiff had recently been fired from an aerobics teaching job. Plaintiff signed up for anger management treatment, and attended six sessions of an anger management class in August and September, 1999.

During an evaluation conducted on October 1, 1999, plaintiff reported feeling out of control, and stated that she had a "horrible" memory deficit and had problems with concentration, anger, and panic attacks. Plaintiff reported that she had lost several jobs since her accident, and said that she needed help with anger and anxiety. Heidi Hart, the Psychiatric Nurse Practitioner who performed the evaluation, noted that plaintiff had clear speech with latencies when attempting to remember or find a word, and that plaintiff's thought processes were "connected although slow at times." Ms. Hart diagnosed Adjustment Disorder with Mixed Disturbance of Emotions and Conduct; and Personality Change due to head trauma, Combined Type. She assessed plaintiff's GAF as 55, and prescribed Zoloft.

On November 12, 1999, plaintiff told her counselor that she was having problems with sleeping and anxiety. Plaintiff told Ms. Hart that she continued to teach fitness classes. Ms. Hart opined that Zoloft was partially effective at relieving plaintiff's anxiety, but had not relieved her depression or insomnia. She increased plaintiff's dose of Zoloft, restarted treatment with Trazodone, and prescribed Ambien. Ms. Hart noted that plaintiff was to continue working on issues of work and career during individual therapy sessions.

On December 23, 1999, plaintiff reported that her anxiety had lessened substantially, and that her mood had improved. Ms. Hart noted that plaintiff's affect was "frustrated," and that her mood was "dysthymic and frustrated." She observed that plaintiff's insight, judgment, and cooperation were excellent, and noted that plaintiff complained of memory problems regarding appointments. Ms. Hart continued plaintiff on her medications, and added prescriptions for Remeron and Buspar.

On January 7, 2000, plaintiff reported that she was having problems getting along with her roommates, was not teaching many aerobics classes, and had "burned her bridges"

with some athletic clubs.  Plaintiff said that one club was underpaying, and wondered if she

was being "harassed."  On January 21, 2000, plaintiff told Ms. Hart that her memory was

"temperamental," and that her depression was worsening, perhaps because of problems with

her boyfriend.

On April 10, 2000, Dr. Erb saw plaintiff for the first time since 1995.  Plaintiff

reported that she had lost four jobs because of inappropriate behavior, and stated that she

often had difficulty with management.  Plaintiff was taking some classes at Portland State

University, and reported that she had been allowed longer time than normal to take exams

while taking classes at Portland Community College.  Plaintiff reported continued memory

problems, impaired social skills, and great difficulty learning new things.  Plaintiff reported

that she became frustrated easily, became anxious, and threw "temper fits."  Dr. Erb noted

that, though plaintiff was very frustrated with "issues," she was able to describe them without

becoming tearful or angry, and opined that plaintiff's "insight and awareness to the

difficulties is significantly improved."  She recommended that plaintiff contact the

Vocational Rehabilitation Division, and become involved with CRS again if a job coach was

needed.

On October 30, 2002, plaintiff was struck by a motor vehicle while riding a bicycle.

Plaintiff was wearing a helmet when she was hit, and did not lose consciousness.  X-rays

performed in January, 2003, revealed a left second metatarsal fracture, but were otherwise

normal.  A CT scan of plaintiff's head, abdomen, and pelvis were normal.

On January 8, 2003, plaintiff was admitted to Emanuel Hospital and Health Center,

and was referred for a psychiatric consultation based on suicidal comments she had made.

Plaintiff stated that she wished she had been killed in the accident, and reported that she had

been jailed twice for harassing her ex-boyfriend.  She later stated that she had no intention of

committing suicide, and indicated that she owned her own home and rented out rooms.

Plaintiff stated that she rode a bicycle 125 miles per week because she did not have a driver's

license, and reported that she was working part-time as an aerobics instructor.  She was

discharged on January 9, 2003.  The discharge diagnosis indicated adjustment disorder,

NOS; a cognitive disorder secondary to head trauma; cannabis abuse; and organic personality

disorder.  Her GAF was rated as 55.

From February, 2002, through March, 2005, plaintiff received mental health

counseling through Lutheran Family Services.  The intake report noted that plaintiff was

well-groomed, fully oriented, cooperative, and of high intelligence.  Plaintiff was described

as having labile and expansive affect, and demonstrating restless motor activity and mildly

obsessive thought content.  Plaintiff was diagnosed with personality change due to traumatic

brain injury, combined type (combined aggressive, labile, paranoid, and disinhibited types).

She was also diagnosed with a major depressive disorder, recurrent, severe, with psychotic

features; a mood disorder due to traumatic brain injury with mixed features; and borderline

personality disorder with symptoms present before traumatic brain injury, based primarily on

her reported history of an eating disorder.  Though Celexa was prescribed, plaintiff did not

have the prescription filled.  Plaintiff reported positive results with Zoloft in April, 2004,

after a failed trial of Wellbutrin.  Plaintiff received mental health counseling to address issues

of impulse control, anger management, and adjustment to personality changes resulting from

her brain injury.  Treatment records include many references to plaintiff's difficulty coping

with a failed relationship, and references to restraining orders prohibiting contact with an ex-

boyfriend.  A summary dated December 4, 2002, rated plaintiff's GAF as 48.

When plaintiff "self terminated" her treatment on March 10, 2005, her GAF was rated

as 68.[1]  A summary prepared at that time indicated that plaintiff had terminated receipt of

services through Lutheran Family Services because she felt that treatment was no longer

needed.  The summary indicated that plaintiff had attended therapy sessions "sporadically,

w/out long term consistency," and stated that plaintiff "was able to improve functioning +

decrease symptoms."

---

[1]That rating indicates that plaintiff experienced "some mild symptoms" or
"some difficulty in social, occupational, or school functioning . . . ."  DSM-VI, 4th ed.

In a letter dated November 17, 2005, to "support [plaintiff's] case for Disability," Patricia Muller, M.S., L.P.C., stated that she had worked with plaintiff as a mental health therapist since February 7, 2002.  Ms. Muller stated that she had witnessed "multiple episodes of [plaintiff's] poor impulse control, paranoia, and emotional lability . . . ."  She stated that plaintiff "would become irate and storm out of my office mid-session," and that she "was unable to overcome obsessive vengeful thoughts and actions towards the new girlfriend of her ex-boyfriend, resulting in criminal charges and restraining orders being filed against her."  Ms. Muller stated that plaintiff had been unable to maintain stable employment "due to interpersonal difficulties resulting from her symptoms."  She added that plaintiff's symptoms "proved unresponsive to numerous therapeutic modalities and interventions, including medications . . . ."  Ms. Muller also stated that, though she had not administered formal testing, "it was quite clear that [plaintiff] had great difficulty sustaining a train of thought."  She added that plaintiff went to "great trouble to compensate for her deficits and try to earn a living."

## Hearing Testimony

At the hearing before the ALJ, plaintiff testified that she had difficulty with her thinking, concentration, and perseverance after her motor vehicle accident.  She stated that, following two years of rehabilitation, she thought that her problems had lessened, but that they returned after she tried working.  At the time of the hearing, plaintiff was teaching a one-hour aerobics class, four times per week.  She also testified that, at that time, it would be difficult for her to work more because of her depression and her "daily dealings with life."

Plaintiff testified that she had been fired from several aerobics jobs, and that Patricia Muller, her therapist at Lutheran Family Services, had told her that she was "crazy."  She stated that paying the $25 fee for therapy sessions was difficult, but that she would continue to receive treatment if she could because she thought it was helpful.  She said that she had told Ms. Muller that she did not need any more help because she was angry with her at the

time.  Plaintiff added that she had problems with her "temperament" since her injury, and that she did not have any friends.

Plaintiff testified that she had some physical problems from her motor vehicle accident, including a disc herniation, but that emotional issues and obsession caused her the greatest difficulties.  She testified that she had smoked marijuana to ease her neck pain for a time, but that she no longer did so.

Plaintiff testified that she had not completed the credits needed for her bachelor's degree because she did not score well enough on the Graduate Record Exam to continue with a master's degree.  She said that her grade point average was 2.8, and that she had "studied nonstop," but saw no point in completing her course work.

Vocational Expert (VE) Susan Burkett testified that plaintiff's past relevant work as an aerobics instructor had been light, skilled, and that her work as a shoe salesperson had been light, semi-skilled.  In his hypothetical, the ALJ described "an individual aged 30 at onset" with plaintiff's experience and education, who could understand, remember, and carry out simple and complex instructions, was restricted to limited contact with coworkers and the public, and required a tolerant supervisor.  The VE testified that the hypothetical individual could not perform plaintiff's past relevant work, but could work as a document scanner, a cleaner/housekeeper, or a small products assembler.

In response to questioning by plaintiff's counsel, the VE testified that an individual whose irrational behavior resulted in accumulated losses of two days of production per month could not sustain competitive employment.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the

national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.


### ALJ's Decision

At step one of his disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the date of her alleged onset of disability.

At step two, the ALJ found that plaintiff's organic mental disorder with a history of brain trauma, affective disorder, and personality disorder were "severe" impairments within the meaning of relevant Social Security regulations.

At step three, the ALJ found that these impairments did not meet or equal any listed impairment.  20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  In reaching this conclusion, the ALJ found that plaintiff's allegations concerning her limitations were not wholly credible.

The ALJ next found that plaintiff retained the functional capacity to perform work at all levels of physical exertion, and work involving simple and complex instructions.  He further found that plaintiff was "limited to work with a tolerant supervisor and limited contact with co-workers and the public."  Based upon this residual functional capacity assessment, at step four, the ALJ found that plaintiff could not perform her past relevant work.

At step five, the ALJ found that plaintiff could perform jobs that existed in substantial numbers in the national economy, including work as a document scanner/microfilmer, cleaner/housekeeper, and small products assembler.  Accordingly, he found that plaintiff was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the Commissioner's decision should be reversed, and this action should be remanded for an award of benefits, because: 1) the ALJ improperly rejected her testimony; 2) the ALJ improperly failed to consider whether her impairments, in combination, met or equaled an impairment in the listings; 3) the ALJ failed to properly assess plaintiff's residual functional capacity; and 4) the ALJ's hypothetical to the VE failed to include all of plaintiff's impairments.

1. <u>ALJ's Credibility Determination</u>

In his enumerated Findings, the ALJ concluded that "claimant's allegations regarding her limitations are not fully credible for the reasons set out in the body of the decision." In the narrative portion of his decision, the ALJ found that "the claimant's allegations of inability to sustain all work activity are excessive and not fully credible."

Correctly noting that she did not assert that she was "incapable of all work activity," plaintiff contends that the ALJ improperly applied a standard requiring claimants to be "utterly incapacitated to be eligible for benefits," and that he failed to provide legally sufficient support for his conclusion that she was not wholly credible.

An ALJ is responsible for determining credibility. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is unsupported by objective medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) (<u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990) (<i>en banc</i>)). Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Id.</u>, (<u>quoting</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995)).

In evaluating a claimant's credibility, the ALJ may consider: (1) ordinary methods of credibility evaluation, including the claimant's reputation for veracity, prior inconsistent statements concerning symptoms, and other testimony by the claimant that reflects upon the claimant's credibility; (2) unexplained or inadequately explained failure to seek treatment or follow a course of treatment prescribed; (3) the claimant's daily activities; (4) objective medical evidence; (5) opinions from medical sources; (6) the location, duration, frequency, and intensity of symptoms; (7) precipitating and aggravating factors; (8) the type, dosage, effectiveness, and side effects of medications; (9) treatment other than medication; and (10) statements from the claimant and others regarding the claimant's symptoms and limitations. 20 C.F.R. § 404.1529(c); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284-85 (9th Cir. 1996).

Plaintiff here presented medical evidence of underlying impairments that could be expected to produce some symptoms, and there was no evidence that plaintiff was malingering. Accordingly, the ALJ was required to provide clear and convincing reasons for concluding that her testimony was not wholly credible.

Based upon a careful review of the ALJ's decision and the underlying record upon which the ALJ relied, I conclude that the ALJ provided legally sufficient reasons supporting his finding that plaintiff's testimony was not wholly credible. Plaintiff correctly notes that she did not testify, as the ALJ asserted, that she was incapable of sustaining "all work activity." However, this overstatement of plaintiff's testimony does not negate the ALJ's legitimate reasons for rejecting plaintiff's testimony or require that this action be remanded for an award of benefits. The ALJ obviously knew that plaintiff did not say she could do no "work activities," as he noted that plaintiff testified that she was doing very limited part-time aerobics instruction at the time of the hearing. In the context of his general discussion of plaintiff's symptoms and testimony, the ALJ's characterization of plaintiff's testimony as alleging an inability to perform "all work activity" was a perhaps inartful reference to plaintiff's testimony that her depression, temperament, and difficulties with social interaction prevented her from performing substantial gainful activity. In the body of his decision, the ALJ explicitly noted that plaintiff testified that her "ability to work was <u>limited</u> by mental impairments." Tr. at 21 [emphasis added]. Contrary to plaintiff's assertions, the ALJ did not erroneously impose a requirement that a claimant be "utterly incapacitated" in order to be eligible for benefits. A fair reading of the ALJ's decision supports only the conclusion that the ALJ correctly understood and acknowledged that a claimant could perform some "work activity" without being able to satisfactorily perform substantial gainful activity.

The ALJ provided clear and convincing reasons supporting his conclusion that plaintiff's allegations about the severity of her impairments was not wholly credible. This support includes the ALJ's observation that plaintiff's testimony in June, 2000, that she was teaching aerobics five times a week, earning passing grades in three classes at Portland State

17 - OPINION AND ORDER

University, and studied during her time outside of class, was inconsistent with her later testimony about the severity of her limitations.  The ALJ's support for his credibility determination also includes the ALJ's observation that plaintiff continued to teach some aerobics classes at the time of the hearing before him, and his observation that plaintiff herself had acknowledged that part of her difficulty in sustaining work as an aerobics instructor resulted from problems with the economy.  The ALJ correctly noted the absence of credible evidence that plaintiff's limitations in concentration, persistence, or pace were more than mild, and cited Ms. Muller's treatment notes, which indicated that plaintiff consistently presented as fully oriented and communicated with "clear, logical and orderly speech."  The ALJ correctly noted that Ms. Muller's report concerning plaintiff's discharge from mental health counseling in March, 2005, stated that plaintiff had experienced decreased symptoms and improved functioning and had a GAF score of 68, which indicated only mild symptoms or some difficulties in social, occupational, or school functioning.  The ALJ also observed that allegations that plaintiff's cognitive impairment prevented plaintiff from working were "inconsistent with her testimony at the current hearing that she had nearly completed work for a Bachelor's degree in speech and hearing with a grade point average of 2.9."  Though the ALJ slightly overstated plaintiff's GPA–plaintiff had testified that her GPA was approximately 2.8–his conclusion that plaintiff's academic performance was inconsistent with an inability to sustain concentration supports his conclusion that plaintiff's allegations concerning the severity of her impairments were not wholly credible.

2. Finding That Plaintiff's Impairments Did Not Meet Or Equal Any Listing

Plaintiff contends that the ALJ erred in finding that her impairments did not meet or equal any of the listings in 20 C.F.R. pt. 404, subpt. P, app.1 (the "Listings"), and failed to provide a "foundation or explanation" for that conclusion.

I disagree.  The "listings" describe impairments that are severe enough to be *per se* disabling.  20 C.F.R. §§ 404.1525; 416.925.  In order to establish disability, it is not enough

for a claimant to simply show a diagnosis of an impairment listed in Appendix 1, because the

impairment must also be of the severity required by the listings for that impairment.  Key v.

Heckler, 754 F.2d 1545, 1549-50 (9th Cir. 1985).  A plaintiff bears the burden of establishing

that an impairment meets or equals a listed impairment.  Burch v. Barnhart, 400 F.3d 676,

683 (9th Cir. 2005).

In his decision denying plaintiff's most recent application for disability benefits, the

ALJ found that plaintiff's severe mental impairments included organic mental disorder with

history of brain trauma, affective disorder, and personality disorder.  That constitutes a

finding that plaintiff satisfied the "A" criteria for Listings 12.02 (organic mental disorders),

12.03 (schizophrenic, paranoid, and other psychotic disorders), 12.04 (affective disorders),

and 12.06 (anxiety related disorders).  However, he fully explained his conclusion that

plaintiff's impairments do not meet or equal the "B" and "C" criteria required for these

impairments to meet or equal the Listings.  As the Commissioner correctly notes, the mild

restriction in activities in daily living; moderate difficulties in maintaining social functioning;

mild difficulties in maintaining concentration, persistence, and pace; and no episodes of

decompensation, which the ALJ found, do not satisfy the "B" criteria.  The Commissioner

also correctly notes that the ALJ found that there was no evidence that plaintiff's severe

mental impairments met the requirements of the "C" criteria, and correctly notes that plaintiff

has not cited evidence supporting the conclusion that these criteria were satisfied.

Plaintiff's contention that the ALJ erred in failing to properly consider whether the

combined effects of her severe impairments equaled a listed impairment likewise fails.  In

order to establish that a combination of impairments equals a listed impairment, a claimant

"must present medical findings equal in severity to *all* the criteria for the one most similar

listed impairment."  Sullivan v. Zebley, 493 U.S. 521, 531 (1990) [emphasis in original].

Unless a claimant presents evidence that the combined effects of her impairments equals a

listed impairment, an ALJ making an equivalency determination is not required to discuss the

combined effects of a claimant's impairment, or to compare those effects to any listed

impairment.  Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005).  In the absence of a proffered plausible theory as to how combined effects of  impairments are equivalent to a listed impairment, courts will not find that an ALJ has erred in assessing the combined effects of impairments.  See, e.g., Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).

Plaintiff here has not cited medical evidence that, singly or in combination, her impairments meet or equal any impairment in the Listing.  Further, a careful review of the record supports the conclusion that the ALJ properly considered the combined effects of plaintiff's impairments.  The ALJ thoroughly summarized the medical evidence, and explicitly set out his conclusion that, singly or in combination, plaintiff's impairments "are not of a severity to meet or medically equal the requirements of any Listing."  Tr. 23.


3. ALJ's Assessment of Plaintiff's Residual Functional Capacity

Plaintiff contends that, in failing to consider her severe impairments in combination with those that were not severe, the ALJ failed to properly assess her residual functional capacity.  Plaintiff argues that the ALJ erred in failing to include any limitation based upon her "inability to behave appropriately on the job . . . ."

This contention fails.  Plaintiff's history of behavioral problems at work, which the ALJ fully acknowledged, consisted of inappropriate interactions with supervisors, co-workers, and the public.  As the Commissioner notes, the ALJ accounted for the limitations in plaintiff's ability to interact appropriately by restricting her to work "with a tolerant supervisor with limited contact with co-workers and the public."


4. Adequacy of the ALJ's Vocational Hypothetical

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments and limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health and Human Services, 717 F.2d 443, 447 (8th Cir. 1983)).  The ALJ's depiction of the claimant's limitations must be "accurate, detailed,

and supported by the medical record." <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. <u>Gallant</u>, 753 F.3d at 1456.

Plaintiff contends that the hypothetical that the ALJ posed to the VE was incomplete because it failed to include a limitation reflecting plaintiff's inability to behave appropriately at work.

This argument fails. As noted above, the ALJ's hypothetical specifically restricted plaintiff to work with a tolerant supervisor and limited contact with co-workers and the public. The ALJ's depiction of plaintiff's limitations included the limitations and impairments supported by the medical record, and accounted for plaintiff's behavioral difficulties.

## CONCLUSION

Plaintiff's request for an Order reversing the Commissioner's decision and remanding the action for an award of benefits is DENIED.

DATED this 17th day of November, 2008.


/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge